**FILED**
CLERK, U.S. DISTRICT COURT

04/21/2026

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ GSA _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>     v.<br><br>ARTEM VLADIMIROVICH REVENSKII,<br>  aka "Digit",<br>  aka "Digits",<br>  aka ".",<br><br>     Defendant. | CR No. 2 26—cr-00240-JAK<br><br>I N F O R M A T I O N<br><br>[18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 1028A: Aggravated Identity Theft; 18 U.S.C. §§ 981, 982, 1030 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The United States of America charges:

INTRODUCTORY ALLEGATIONS AND DEFINITIONS

At all times relevant to this Information:

A.    Defendant and Co-Conspirators

1.    Defendant ARTEM VLADIMIROVICH REVENSKII, also known as ("aka") "Digit," aka "Digits," aka ".", primarily resided in Russia.

2.    Co-Conspirator A, Co-Conspirator B, Co-Conspirator C, Co-Conspirator D, Co-Conspirator E, Co-Conspirator F, and Co-Conspirator G resided in Russia.

3.    22C was a Russian cybercriminal hacking group that, among other things, provided hacked and leaked personal information to its members.  Co-Conspirator A, Co-Conspirator B, and Co-Conspirator C

were members of 22C. Defendant conspired with members of 22C to further their illegal activities.

4.    Sector16 was a Russian government-sponsored hacking group established no later than January 2025 that targeted industrial control systems ("ICS") and supervisory control and data acquisition ("SCADA") systems in countries that were perceived to be enemies of Russia, including the United States of America and Ukraine.  Co-Conspirator D was the leader of Sector16, and defendant conspired with members of Sector16 to further their illegal activities.  Co-Conspirator E, Co-Conspirator F, and Co-Conspirator G were cybercriminals who conspired with defendant, including on Sector16 cyber attacks.

B.    Definitions

5.    Telegram is a cloud-based encrypted messaging service that allows users to post messages in public channels and message users directly.

6.    Trafer or Traffer is a term used in Russian cybercriminal forums to refer to the actor responsible for directing victim users to a malicious platform (commonly through malware, phishing, or internet scams), for the purpose of harvesting and stealing their computer and website credentials.

7.    Supervisory Control and Data Acquisition ("SCADA") is a computer-based system that collects, analyzes, and displays real-time data from remote sites to monitor and control industrial processes. SCADA systems are commonly used in utilities, manufacturing, oil and gas production, and water and wastewater treatment facilities.

8.    A brute force attack is when a hacker uses trial-and-error to try to systematically guess the password associated with an

account. This can be done manually or with automated software that can use a preset list of common passwords.

//

//

//

COUNT ONE

[18 U.S.C. § 1349]

The United States or America hereby realleges and incorporates paragraphs 1 through 8 of the Introductory Allegations and Definitions of this Information.

A.    OBJECT OF THE CONSPIRACY

Beginning on a date unknown, but no later than on or around October 22, 2024, and continuing through on or around October 31, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant REVENSKII and others known and unknown to the United States of America, knowingly conspired and agreed with each other to commit Wire Fraud, in violation of Title 18, United States Code, Section 1343.

B.    MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished, and was accomplished, in substance, as follows:

1.    Defendant REVENSKII and his co-conspirators, including members of 22C, would engage in a booking refund fraud in collaboration with complicit hotels to use stolen, illegally purchased, and/or hacked website credentials of victims to make hotel reservations using stolen funds.

2.    Defendant REVENSKII would identify hotels and would direct others, including members of 22C, to contact the hotels to determine if hotel personnel were willing to be complicit in receiving fraudulent bookings.

3.    Defendant REVENSKII would direct co-conspirators to negotiate the split of stolen funds among the complicit hotel participants and the co-conspirators.

4.    Defendant REVENSKII would obtain a spreadsheet containing tens of thousands of usernames and passwords for travel booking websites from a co-conspirator and then would share that spreadsheet with Co-Conspirator B and Co-Conspirator C for the purpose of accessing victims' online booking accounts.

5.    Co-Conspirator B would attempt to use the usernames and passwords to login to victim accounts to determine if they had payment information saved to those accounts, and if so, co-conspirators would use that payment information to conduct fraudulent bookings.

6.    If the username and password combination from the account information spreadsheets did not work, Co-Conspirator C would try to gain access to victims' travel booking accounts using brute force methods such as guessing common passwords.

7.    Defendant REVENSKII and co-conspirators, including members of 22C, would make fraudulent bookings at complicit hotels and distribute the stolen funds to co-conspirators.

8.    Defendant REVENSKII also developed an alternative method to engage in hotel booking fraud by creating fake travel agent websites to lure victims to view the website and then install malware on the victims' computers, which would enable defendant REVENSKII and his co-conspirators to remotely access those victim machines.

9.    Defendant REVENSKII and co-conspirators, including members of 22C, would then use this remote access to victim computer systems to obtain personal information, including financial billing information.

10.    Defendant REVENSKII and co-conspirators, including members of 22C, would use illegally obtained personal information to make

fraudulent bookings with complicit hotels who would then share a portion of money obtained from the booking.

11.  As a result, defendant REVENSKII and co-conspirators, including members of 22C, intended to secure at least $153,923.63 from the fraudulent hotel booking scheme.

C.    OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendant REVENSKII and others known and unknown, committed and knowingly caused others to commit various overt acts within the Central District of California, and elsewhere, including but not limited to the following:

Overt Act No. 1:    On October 22, 2024, defendant REVENSKII directed Co-Conspirator A to analyze hotel chains at a particular link noting, "There are hotels in the USA."

Overt Act No. 2:    On October 25, 2024, Co-Conspirator A asked defendant REVENSKII whether there were updates regarding the hotels.

Overt Act No. 3:    On October 27, 2024, defendant REVENSKII advised Co-Conspirator A concerning how to structure financial transactions so that they would not be flagged for fraud.

Overt Act No. 4:    On October 30, 2024, defendant REVENSKII provided Co-Conspirator A with an update on the fraudulent hotel booking scheme stating, "Hotels in Bali went to the meeting. Today [they'll] start sending numbers on booking."

Overt Act No. 5:    On October 31, 2024, defendant REVENSKII relayed to Co-Conspirator A an update from an unnamed co-conspirator about negotiations with complicit hotels saying, "Well, some have questions, kind of like: how are [we] withdrawing money, from a hotel? Payment with a card (who knows from where and which one). Then

6

are we registering for a return or something different? [We] need to have them to understand. Already have hotels."

Overt Act No. 6:    On October 31, 2024, defendant REVENSKII sent Co-Conspirator A links to hotels on popular travel booking websites.

Overt Act No. 7:    On November 3, 2024, defendant REVENSKII sent Co-Conspirator B information concerning the financial split of proceeds resulting from the fraudulent hotel bookings explaining 50% would go to the hotel, 25% to the trafer, 10% to defendant REVENSKII, 10% to Co-Conspirator A, and 5% to Co-Conspirator C.

Overt Act No. 8:    On November 3, 2024, Co-Conspirator C sent himself an email discussing the specific conditions needed for the hotel booking fraud including identifying which booking websites would be used and methods to evade potential suspicion of fraud which would block the transaction.

Overt Act No. 9:    On November 3, 2024, defendant REVENSKII discussed with Co-Conspirator B the current status of negotiations with hotel accomplices to the booking fraud stating "We are not uploading anything yet. We are waiting if they will agree. Negotiations are ongoing."

Overt Act No. 10:    On an unknown date, but no later than November 11, 2024, defendant REVENSKII obtained two Excel spreadsheets containing tens of thousands of victim usernames and passwords to access accounts on booking websites from an identified co-conspirator.

Overt Act No. 11:    On an unknown date, but no later than November 11, 2024, defendant REVENSKII transferred the two Excel spreadsheets containing tens of thousands of victim usernames and

passwords to Co-Conspirator B and Co-Conspirator C, including information for victims located in the Central District of California.

COUNT TWO

[18 U.S.C. § 371]

The United States of America hereby realleges and incorporates by reference paragraphs 1 through 8 of the Introductory Allegations and Definitions of this Information as though fully set forth herein.

A.    OBJECT OF THE CONSPIRACY

Beginning on a date unknown, but no later than February 2025, and continuing through on or about October 31, 2025, defendant REVENSKII with others known and unknown, knowingly conspired and agreed with each other to intentionally cause damage without authorization to a protected computer, in violation of Title 18, United States Code, Section 1030(a)(5)(A).

B.    MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished, and was accomplished, in substance, as follows:

1.    On or before January 2025, Co-Conspirator D created Sector16.

2.    Co-Conspirator D would recruit individuals with expertise in computer intrusions and offer financial compensation to individuals who gained unauthorized access and damaged SCADA systems of oil and gas infrastructure facilities in certain countries, including the United States, Ukraine, and other NATO Members.

3.    Beginning in approximately February 2025, defendant REVENSKII would work with Co-Conspirator E and members of Sector16 to develop business plans to professionalize the planned SCADA attacks against critical infrastructure.

4.    Sector16 members would primarily gain access to SCADA systems by scanning the internet for open ports in SCADA systems in

target countries and attempt to gain unauthorized access to those systems.

5. Sector16 members would conduct internet research to obtain additional information about the systems to which they gained access to further develop the business proposal outlining the planned cyber-attack.

6. Defendant REVENSKII would then use these plans for SCADA attacks to sell Sector16's services to the Russian government.

7. Defendant REVENSKII would develop a plan with Co-Conspirator E and members of Sector16 to engage in sabotage of Ukraine's critical infrastructure including a cyber-attack on a natural gas facility in the city of Poltava, a plot against gas stations in Kiev, and a plan to disable the entire Ukrainian electrical grid with the intention of causing numerous harms to Ukraine including, but not limited to, a physical breakdown of equipment at substations, power plants, and nuclear power plants; cutting off electricity to cities; reducing operational efficiency; opening locks of a hydroelectric plant to flood territories; and drone production failure.

8. Between approximately March 2025 and July 2025, defendant REVENSKII would work with Co-Conspirator D and Sector16 to obtain unauthorized access to vulnerable SCADA systems in the United States with the intention of damaging each facility.

9. Between February 2025 and no later than October 31, 2025, defendant REVENSKII would provide thousands of dollars to Co-Conspirator D and Sector16 to facilitate the group's hacking activities.

C.    OVERT ACTS

On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant REVENSKII and co-conspirators known and unknown, committed and knowingly caused others to commit various overt acts including, but not limited to, the following:

Overt Act No. 1:    On an unknown date but no earlier than January 2025, an unknown co-conspirator gained unauthorized access to the SCADA systems of an oil facility in Texas enabling members of Sector16 to control oil pumps and storage reservoirs at the Texas facility.

Overt Act No. 2:    On September 17, 2025, defendant REVENSKII, in a private text message, discussed with Co-Conspirator F a plan to shut down the electrical grid in Ukraine explaining that defendant REVENSKII expects to receive 5,000,000 rubles (approximately $59,500 USD) to turn off all the electricity in Ukraine for three days, and saying "This project has already started. The money upfront given."

Overt Act No. 3:    On September 22, 2025, Co-Conspirator D, in a private text message, sent defendant REVENSKII a screenshot demonstrating unauthorized access to a non-public SCADA system for an oil and gas facility in North Dakota.

Overt Act No. 4:    On September 22, 2025, defendant REVENSKII, in a private text message, forwarded the screenshot of the SCADA system from an oil and gas facility in North Dakota to Co-Conspirator G and discussed whether the Russian government would be interested in paying for the SCADA access.

Overt Act No. 5:    On September 29, 2025, defendant REVENSKII, in a private text message, discussed with Co-Conspirator F the plan

11

for using a computer intrusion to cause damage to a natural gas facility in Poltava, Ukraine, stating, "Full access to gas equipment control. Hardware Impact Attack. Consequences: Gas pipeline deformation. Overload of ventilation equipment. Gas extraction equipment overload. Ignition. Explosion. Failure of the video surveillance system, power supply and distribution. Total damages from $600,000."

Overt Act No. 6:   On September 29, 2025, defendant REVENSKII, in a private text message, sent five images to Co-Conspirator F showing internal, non-public information from a SCADA system of a natural gas facility in Poltava, Ukraine.

Overt Act No. 7:   On September 30, 2025, defendant REVENSKII, in a private text message, discussed with Co-Conspirator F that Sector16 was offered $75,000 if the group can cause a natural gas facility in Poltava, Ukraine, to explode.

Overt Act No. 8:   On September 30, 2025, defendant REVENSKII, in a private text message, discussed with Co-Conspirator E the expected payment for the upcoming cyber-attack on a gas facility in Poltava, Ukraine, stating they expected to receive $12,000 for media confirmation of an explosion.

Overt Act No. 9:   Between approximately March 2025 and July 2025, defendant REVENSKII collaborated with Co-Conspirator D and Sector16 on approximately four to seven SCADA attacks on facilities in the United States including facilities in the states of New York and Pennsylvania.

Overt Act No. 10:   On October 3, 2025, Co-Conspirator E, in a private text message, discussed with defendant REVENSKII the media coverage of the cyber-attack on natural gas infrastructure in

Poltava, Ukraine, saying "Because the attacks have crossed with our attack. But there is no media coverage of drone strikes on the gas infrastructure. After 8-10 hours it began to be [sic]. Appear. I believe that the cyber attacks are hidden under drone strikes."

COUNT THREE

[18 U.S.C. § 1028A]

The United States of America re-alleges and incorporates here paragraphs 1 through 8 of the Introductory Allegations of this Information.

Beginning on or about October 22, 2024, and continuing until no later than November 11, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant REVENSKII, together with others known and unknown to the United States of America, each aiding and abetting the other, knowingly transferred, possessed, and used, without lawful authority, a means of identification that defendant knew belonged to another person, namely, username and password combinations belonging to numerous victims, including victim E.B., a resident of the Central District of California, during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Wire Fraud, as charged in Count 1.

14

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts One or Three of this Information.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)    All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b)    To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

15

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982, 1030]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982(a)(2) and 1030, in the event of any defendant's conviction of the offense set forth in Count Two of this Information.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense;

(b) Any personal property used or intended to be used to commit the offense; and

(c) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1), 1030(i), and 1029(c)(2), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

16

court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

MAXWELL COLL
Assistant United States Attorney
Deputy Chief, National Security Division

ALEXANDER S. GORIN
Assistant United States Attorney
National Security Division