TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
ALEXANDER S. GORIN (Cal. Bar No. 326235)
Assistant United States Attorney
National Security Division
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3190
    Facsimile: (213) 894-0140
    E-mail:   alexander.gorin@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**FILED**
CLERK, U.S. DISTRICT COURT
04/21/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ GSA _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR  2:26-cr-00240-JAK |
|     Plaintiff, | <u>PLEA AGREEMENT FOR DEFENDANT</u> <u>ARTEM VLADIMIROVICH REVENSKII</u> |
|         v. | |
| ARTEM VLADIMIROVICH REVENSKII, aka "Digit", aka "Digits", aka ".", | |
|     Defendant. | |

1.   This constitutes the plea agreement between Artem Vladimirovich REVENSKII ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

//

<u>DEFENDANT'S OBLIGATIONS</u>

2.   Defendant agrees to:

a.   Give up the right to indictment by a grand jury and, at the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to a three-count information in the form attached to this agreement as Exhibit A or a substantially similar form, which charges defendant with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349; Conspiracy to Intentionally Damage a Protected Computer Without Authorization, in violation of 18 U.S.C. § 371; and Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A(a).

b.   Not contest facts agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the USAO, United States Probation and Pretrial Services Office, and the Court.

g.   Pay the applicable special assessment[s] at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

h.   Agree to and not oppose the imposition of the following conditions of probation or supervised release:

i.    Defendant shall possess and use only those digital devices, screen usernames, email accounts, social media accounts, messaging applications, and cloud storage accounts, as well as any passwords or passcodes for all such digital devices and accounts, that have been disclosed to the Probation Officer upon commencement of supervision. Any new devices, accounts, applications, passwords, or passcodes are to be disclosed to the Probation Officer prior to the first use. A digital device is any electronic system or device that can access, view, obtain, store, or transmit digital data related to email accounts, financial accounts, and social media accounts.

ii.    All computers, computer-related devices, and their peripheral equipment, used by defendant shall be subject to search, seizure, and computer monitoring. This shall not apply to items used at the employment site that are maintained and monitored by the employer.

iii.   Defendant shall comply with the rules and regulations of the Computer Monitoring Program. Defendant shall pay the cost of the Computer Monitoring Program unless defendant demonstrates an inability to pay, as determined by the Probation Officer.

iv.    Defendant shall submit defendant's person, property, house, residence, vehicle, papers, computers, cell phones, other electronic communications or data storage devices or media, email accounts, social media accounts, cloud storage accounts, or other areas under the defendant's control, to a search conducted by a United States Probation Officer or law enforcement officer. Failure to submit to a search may be grounds for revocation. The defendant

3

shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search pursuant to this condition will be conducted at a reasonable time and in a reasonable manner upon reasonable suspicion that the defendant has violated a condition of his supervision and that the areas to be searched contain evidence of this violation.

THE USAO'S OBLIGATIONS

3.   The USAO agrees to:

a.   Not contest facts agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained in this agreement.

c.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

d.   Except for criminal tax violations (including conspiracy to commit such violations chargeable under 18 U.S.C. § 371), not further criminally prosecute defendant for additional violations of 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. §§ 1029(a)(2), (3), (5) (Access Device Fraud), 18 U.S.C. § 371 (Conspiracy to Commit Access Device Fraud); and 18 U.S.C. § 1030 (Computer Fraud and Abuse) arising out of defendant's conduct described in the agreed-to factual basis set forth in paragraph 16 below.  Defendant understands that the USAO is free to criminally prosecute defendant for any other unlawful past conduct or any unlawful conduct that occurs after the date of this agreement.  Defendant agrees that at the time of

4

sentencing the Court may consider the uncharged conduct in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

NATURE OF THE OFFENSES

4.    Defendant understands that for defendant to be guilty of the crime charged in Count One of the Information, that is, conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, the following must be true: (1) there was an agreement between two or more persons to commit wire fraud; and (2) defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

Defendant understands that for defendant to be guilty of the object of the conspiracy, wire fraud, in violation of Title 18, United States Code, Section 1343, the following must be true: (1) defendant knowingly participated in a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises, (2) the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property, (3) the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

5.    Defendant understands that for defendant to be guilty of the crime charged in Count Two of the Information, that is,

5

conspiracy to cause intentional damage a protected computer, in violation of Title 18, United States Code, Section 371, the following must be true: (1) there was an agreement between two or more persons to commit at least one crime as charged in the information, to wit: causing intentional damage to a protected computer, in violation of Title 18, United States Code, Section 1030(a)(5)(A); (2) defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

6. Defendant understands that for defendant to be guilty of the object of the conspiracy, that is, causing intentional damage to a protected computer, in violation of Title 18, United States Code, Section 1030(a)(5)(A), the following must be true: (1) defendant knowingly caused the transmission of a program, code, command, or information; (2) as a result of the transmission, the defendant intentionally caused damage to a computer, that is, impaired without authorization the integrity or availability of data, programs, systems, or information; and (3) the computer was a protected computer, that is, the computer was used in or affected interstate or foreign commerce or communication, or was located outside the United States but was used in a manner that affects interstate or foreign commerce or communication of the United States.

7. Defendant understands that for defendant to be guilty of the crime charged in Count Three of the Information, that is, Aggravated Identity Theft, in violation of Title 18, United States Code, Section 1028A(a)(1), the following must be true: (1) defendant knowingly transferred, possessed, or used, without legal authority, a

means of identification of another person; (2) defendant knew that the means of identification belonged to a real person; and (3) defendant did so during and in relation to the commission of a felony violation, to wit conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349.

PENALTIES

8.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1349, is: 20 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

9.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is: 5 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

10.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1028A(a)(1), is: two years' imprisonment; a one-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

11.   Defendant understands, therefore, that the total maximum sentence for all offenses to which defendant is pleading guilty is: 27 years imprisonment; a 3-year period of supervised release; a fine of $750,000 or twice the gross gain or gross loss resulting from the

7

offenses, whichever is greatest; and a mandatory special assessment of $300.[1]

12.  Defendant understands that the statutory mandatory minimum sentence that the Court must impose for a violation of Title 18, United States Code, Section 1028A(a)(1), is: two years' imprisonment, which must run consecutive to any other sentence of imprisonment, and a mandatory special assessment of $100.

13.  Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

14.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the convictions in this case

---

[1] Defendant understands that there is case law suggesting that the term of supervised release on Count Three could be imposed to run consecutively to the terms of supervised release on the other counts. While the USAO does not intend to seek a consecutive term of supervised release, defendant understands that if the Court were to impose a consecutive term of supervised release, the maximum term of supervised release for all of the counts of conviction would be 4 years, rather than 3 years as stated in the text above.

may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

15.  Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the convictions in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his convictions on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his pleas may entail, even if the consequence is automatic removal from the United States.

FACTUAL BASIS

16.  Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the

9

Sentencing Guidelines factors set forth in paragraph 18 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct. The Information in this case is incorporated herein by reference.

**A.    Wire Fraud Conspiracy and Aggravated ID Theft**

1.    Background on the Hotel Conspiracy

Beginning from at least October 22, 2024, and continuing through no later than October 31, 2025, within the Central District of California, and elsewhere, defendant knowingly conspired with Co-Conspirator A, Co-Conspirator B, Co-Conspirator C, and others, to commit wire fraud. Defendant participated in and knew of the agreement to commit wire fraud and intended to help accomplish the objects of the conspiracy. Defendant admits his participation in the conspiracy alleged in Count One of the Information and the allegations contained in overt acts 1 through 11 of that count.

The wire fraud conspiracy used and attempted to use hacked or stolen website credentials to make fraudulent hotel reservations using victim payment information.  The hacked or stolen credentials included those of victims in the Central District of California.  The scheme was designed to make these fraudulent bookings at particular hotels that would enable defendant and his co-conspirators to obtain victim funds before a fraud alert could unwind the transactions. Defendant then planned to split the stolen proceeds among himself and co-conspirators, including complicit personnel at target hotels. Defendant played a significant role in managing the scheme, including obtaining the stolen travel website credentials from numerous victims, identifying and directing negotiations with complicit

hotels, directing co-conspirators to engage in the fraudulent transactions, and developing a scheme to obtain stolen payment information through fraudulent travel agency websites that would contain malware in an attempt to increase the financial success of the conspiracy. . During and in relation to this wire fraud conspiracy, defendant knowingly committed aggravated identity theft by transferring, possessing, and using, without lawful authority, a means of identification that defendant knew belonged to another actual person. While engaging in this conspiracy, defendant used multiple aliases including the Cyrillic alias "Цифры" which translates to English as "digit" or "digits." Defendant also used the alias ".". Defendant agrees that for all times relevant to the conspiracy, defendant engaged in the scheme primarily from Russia.

Specifically, in approximately mid-2024, Defendant met online members of the cybercriminal group 22C, including Co-Conspirator A, Co-Conspirator B, and Co-Conspirator C. Beginning on at least October 22, 2024, defendant engaged in discussions with Co-Conspirator A, Co-Conspirator B, and Co-Conspirator C about a scheme to use stolen, purchased, and/or hacked website credentials of victims to make hotel reservations under fraudulent pretenses for personal financial gain. Co-Conspirator C initially worked with two unknown co-conspirators to collect website credentials for use in potential hotel booking fraud. The scheme initially involved hotels identified by Co-Conspirator A in the country of Georgia and Turkey. Beginning in October 2024, and continuing through at least December 2024, defendant developed a more technically complex scheme where he would use malware to access entire victim computers rather than just travel booking accounts, which was ultimately unsuccessful. In this version of the scheme,

defendant planned to use malware which could exploit traffic from Google Ads. Defendant and his co-conspirators planned to create multiple spoofed travel agency websites which victims would reach by clicking on malicious Google advertisements. The fake sites would then be used to host malware and infect victim computers. Primarily, defendant and his co-conspirators used hacked and/or leaked website credentials, as well as brute force attacks[2] in furtherance of this scheme.

                 2.    Identification and Communication with Complicit Hotels

Defendant was responsible for identifying potential hotels and then directing co-conspirators to negotiate with managers at those hotels to secure their involvement in the booking fraud scheme. Defendant identified between five and seven hotels that were interested in collaborating on the fraudulent scheme. Defendant connected with an unnamed co-conspirator in Thailand who worked at defendant's direction to find hotel managers that were open to exchanging dirty money. Defendant, via Co-Conspirator C, learned that the scheme would likely have more success with complicit hotels in Dubai and in the Maldives.

Co-Conspirator C was responsible for advising complicit hotels how to respond if a booking website flagged the hotel for suspicious activity. Co-Conspirator C created forged documents to help prevent complicit hotels from being banned from online travel booking platforms.

---

[2] A brute force attack is when a hacker uses trial-and-error to try to systematically guess the password associated with an account. This can be done manually or with automated software that can use a preset list of common passwords.

3. Defendant Obtains and Directs the Use of Stolen Victim
Account Credentials

On a date on or before November 3, 2024, defendant REVENSKII contacted a "trafer"[3] to obtain website credentials for over 20,000 victims' user accounts for various travel booking websites. Defendant received two Excel spreadsheets from this co-conspirator, which contained tens of thousands of victims' username and password combinations for booking websites (the "Website Credentials Spreadsheets"). The Website Credentials Spreadsheets contained authentication features and means of identification for each victim, who defendant knew were real people, such as their email address (which served as an account username), the password associated with that account, and the booking website that corresponded to the username and password pair. At least two of these username and password combinations in the Website Credentials Spreadsheets belonged to victims of the scheme who were located in the Central District of California, and who did not share their account passwords with anyone or authorize anyone to access those accounts. Defendant did not have legal authority to possess, transfer, or use, the means of identification belonging to the victims in the Website Credentials Spreadsheets.

No later than November 11, 2024, Defendant transferred the Website Credentials Spreadsheets to Co-Conspirator B and Co-Conspirator C during and in relation to the hotel booking fraud

---

[3] A "trafer" or "traffer" is a term used in Russian cybercriminal forums to refer to the actor responsible for directing victim users to a malicious platform (commonly through malware, phishing, or internet scams), for the purpose of harvesting and stealing their computer and website credentials.

conspiracy charged in Count One of the Information. Defendant directed Co-Conspirator B to use the Website Credentials Spreadsheets to identify what accounts had still working username and password combinations and financial information saved to the account. Defendant intended for the stolen account credentials to be used to make fraudulent bookings with hotels that had agreed to be complicit in the booking scheme. Once the booking was made, the hotel employee co-conspirator would charge the victim credit card to the hotel directly for the fraudulent reservation, divert the proceeds of the fraudulent reservation, keep a cut, and send the rest of the fraudulently obtained funds back to cryptocurrency accounts that the co-conspirators controlled.

> 4.   Conspiracy Designed to Profit from Victim Funds

Defendant determined the distribution of these stolen funds would be 50% to the co-conspirator hotel, 25% to the trafer, 10% to defendant, 10% to Co-Conspirator A, and 5% to Co-Conspirator C. Defendant communicated this breakdown of illicit proceeds to Co-Conspirator B on November 3, 2024, via private message. Defendant kicked Co-Conspirator A out of the scheme in approximately December 2024.

Between October 28, 2024, and March 31, 2025, the booking fraud conspiracy was responsible for no less than $153,923.63 in intended loss from fraudulent hotel bookings at least $18,000 of which was actual loss. These fraudulent hotel bookings were either made or attempted using either stolen credentials from the Website Credentials Spreadsheets or through accessing the accounts through brute force methods.

**B.    Oil and Gas Facility Hacking Conspiracy**

Beginning no later than February 2025, and continuing through no later than October 31, 2025, defendant and others conspired to intentionally damage protected computers without authorization in order to interfere with the operation of oil and gas critical infrastructure in the United States, Ukraine, and other European countries. Defendant admits his participation in the conspiracy alleged in Count Two of the Information and the allegations contained in overt acts 1 through 10 of that count.

**1.    Background on Sector16**

Beginning on an unknown date on or before January 2025, Co-Conspirator D created Sector16, which is a Russian government-sponsored hacking group that has targeted oil and gas production facilities in the United States, Ukraine, Latvia, France, Germany, and other nations that are perceived to be enemies of the Russian government. Members of Sector16 use computer intrusion techniques to gain unauthorized access to industrial control systems ("ICS") and supervisory control and data acquisition (SCADA) systems. In January 2025, Sector16 posted a public video with Russian hactivist[4] group Z-Pentest (also known as the Cyber Army of Russia_Reborn or CARR), showing their cyber intrusion of a SCADA system managing oil pumps and storage tanks in Texas.  Sector16 operated a public Telegram channel where it posts videos and statements related to their activities, including claims of compromising U.S. energy infrastructure. Sector16's primary technique to gain access to SCADA systems was to scan the internet for open ports in SCADA systems and

---

[4] Hacktivism describes computer hacking done in furtherance of political goals.

15

use a saved "dictionary" of common or default passwords. Unknown members of Sector16 made posts on the group's public Telegram channel taking credit for numerous SCADA attacks, including:

- "Today, a young English-speaking hacker, together with a team from "SECTOR16", attacked the automated control system (SCADA) for oil pumps and reservoirs in TEXAS, the system was hacked and completely broken, oil production was stopped, the system was completely destroyed."

- "Today our Secror16 [sic] team together with our brothers from Russia OverFlame, attacked and managed to gain full access to one of the hydroelectric power plants in France. The company [VICTIM] in the city of Maser-sur-Salat! The valves were broken, the seals were damaged by increasing the pressure, the server failed, the flow power in the group settings was increased, which will inevitably lead to wear of the equipment and strategically important parts for work."

- "As promised! Our team after a successful attack was able to gain full access to the pulp and paper mill in German, the city of Frankfurt-am-Main, the company [VICTIM]. We changed the values of the gearbox thrust bearings, changed the operating hours of the equipment, made changes to the turbine operation and the water level, and also changed the water temperature program! The administrators of this server should think about the security of their company and allocate money to protect the servers!"

16

2.    Defendant's Involvement in Sector16

On an unknown date in February 2025, defendant met online Co-Conspirator D, the leader of Sector16. Defendant agreed to provide advice to Co-Conspirator D and members of Sector16 to increase the group's ability to sell its services to various customers, including the Russian government. Defendant paid Co-Conspirator D and Sector16 approximately $7,000 to $10,000 to support Sector16's activities in gaining access to SCADA systems in Ukraine, Europe and the United States. Generally, when Defendant worked on a project with Sector16, he, with co-conspirators, outlined the goals of the cyber-attack in an attempt to sell the project. Defendant agrees that the SCADA systems described qualify as protected computers within the meaning of Title 18, United States Code, Section 1030.

3.    Attacks on SCADA Systems and Critical Infrastructure in Ukraine

Defendant, Co-Conspirator D, and Co-Conspirator E worked together on sabotage tasks in Ukraine, including a cyber-attack on a natural gas facility in Poltava, a plot against gas stations in Kiev, and a project to disable the Ukrainian electrical grid for three days.

On September 29, 2025, unknown members of Sector16 successfully gained unauthorized access to the SCADA systems of a natural gas facility in the city of Poltava, Ukraine. Co-Conspirator D proved the group's unauthorized access by sharing a screenshot of the facility's internal SCADA systems with defendant on September 29, 2025. Also on September 29, 2025, Defendant discussed the plan for the cyber-attack on the Poltava-based facility with Co-Conspirator F, stating that the intended consequences included: gas pipeline deformation, overload of

17

ventilation equipment, gas extraction equipment overload, ignition, explosion, failure of the video surveillance system, power supply and distribution, and that they intended to achieve "[t]otal damages from $600,000."

Defendant then prepared a proposal about the cyber-attack in Poltava to share with potential customers, including the Russian government and to secure funding if the attack is successful. In that proposal, defendant stated that the "attack is carried out by changing the settings of the key equipment operation to critical parameters, as well as disabling the security system."  Defendant stated in the proposal that the security implications of the attack included "Fires and explosions: Gas leaks combined with ignition sources (e.g. sparks from equipment) can lead to fires and explosions, This could lead to loss of life and destruction of equipment." Defendant's proposal also noted that "it can be very expensive to repair damaged equipment."

On October 3, 2025, at least one member of Sector16 used the unauthorized access to the SCADA systems of the Poltava-based gas facility to make numerous changes to the settings within the system and caused the system to detect a critical error.

### 4.   Sector16 Attacks in the United States

Defendant worked with Co-Conspirator D and Sector16 on multiple SCADA attacks in the United States between approximately March 2025 and no later than October 31, 2025. Sector16, working with defendant, compromised at least four to seven SCADA systems in the United States, including an oil and gas facility in North Dakota.

In one instance, at least one unknown member of Sector16 obtained unauthorized access to a SCADA system in North Dakota, and

took a screenshot of non-public information from that equipment control system. On September 22, 2025, Co-Conspirator D sent that screenshot to defendant who forwarded it to Co-Conspirator G to see if any customers, including the Russian government, was interested in paying Sector16 for that unauthorized access.

In another case, Co-Conspirator D obtained access to the largest oil rig in the United States. However, while the group was looking for someone to fund the attack and while they were negotiating with "buyers", the group lost access to the facility.

SENTENCING FACTORS

17. Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate between the mandatory minimum and up to the maximum set by statute for the crimes of conviction.

18. Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

**Count One**

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss Exceeds $150,000 | +10 | U.S.S.G. § 2B1.1(b)(1)(F) |

19

| | | |
|---|---|---|
| 10+ Victims | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(i) |
| Substantial Part Outside the US | +2 | U.S.S.G. § 2B1.1(b)(10)(B) |
| Authentication Feature | +2 | U.S.S.G. § 2B1.1(b)(11)(A)(ii) |

**Count Two**

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Loss Exceeds $600,000 | +14 | U.S.S.G. § 2B1.1(b)(1)(F) |
| 10+ Victims | +2 | U.S.S.G. § 2B1.1(b)(2)(A)(i) |
| Substantial Part Outside the US | +2 | U.S.S.G. § 2B1.1(b)(10)(B) |
| 1030(a)(5)(A) | +4 | U.S.S.G. § 2B1.1(b)(19)(A)(ii) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate. Defendant understands that the Court must sentence defendant to a term of two years imprisonment on Count Three, which must run consecutive to any term of imprisonment imposed for Count One.

19. Defendant understands that there is no agreement as to defendant's criminal history or criminal history category, and no agreement regarding "Grouping" of the counts of conviction under Part D of Chapter 3 of the United States Sentencing Guidelines.

20. Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

WAIVER OF CONSTITUTIONAL RIGHTS

21. Defendant understands that by pleading guilty, defendant gives up the following rights:

    a. The right to persist in a plea of not guilty.

b.    The right to a speedy and public trial by jury.

c.    The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

d.    The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.    The right to confront and cross-examine witnesses against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

WAIVER OF VENUE

22.  Having been fully advised by defendant's attorney regarding the requirements of venue with respect to the offenses to which defendant is pleading guilty, to the extent the offenses to which defendant is pleading guilty were committed, begun, or completed outside the Central District of California, defendant knowingly, voluntarily, and intelligently waives, relinquishes, and gives up: (a) any right that defendant might have to be prosecuted only in the

21

district where the offenses to which defendant is pleading guilty were committed, begun, or completed; and (b) any defense, claim, or argument defendant could raise or assert based upon lack of venue with respect to the offenses to which defendant is pleading guilty.

### WAIVER OF RETURN OF DIGITAL DATA

23.  Understanding that the government has in its possession digital devices and/or digital media seized from defendant, defendant waives any right to the return of digital data contained on those digital devices and/or digital media and agrees that if any of these digital devices and/or digital media are returned to defendant, the government may delete all digital data from those digital devices and/or digital media before they are returned to defendant.

### LIMITED WAIVER OF DISCOVERY

24.  In connection with the defendant's plea of guilty, the defendant, in consultation with counsel, has chosen not to request discovery materials pursuant to Fed. R. Crim. P. 16 ("Rule 16 Material"). The defendant understands that if not for entering this plea of guilty, the Government would be required to produce Rule 16 Material, and would further be required to produce material pursuant to Brady v. Maryland, 373 U.S. 83 (1963) and Fed R. Crim. P. 5(f), and, if the defendant proceeded to trial, impeachment material pursuant to Giglio v. United States, 405 U.S. 150 (1972), and Jencks Act material. The defendant acknowledges that the defendant has not and will not receive such information because the defendant has decided to plead guilty, waives the right to this information, and agrees not to withdraw the defendant's plea or to attack the defendant's conviction or sentence, either on direct appeal or collaterally, on the ground that the Government has failed to produce

22

any such information, apart from any information establishing the factual innocence of the defendant. The government agrees not to use at sentencing any of the withheld material without providing it to defendant.

WAIVER OF APPEAL OF CONVICTION

25.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK

26.  Defendant agrees that, provided the Court, before imposition of the mandatory consecutive sentence of two years imprisonment on count two, imposes a term of imprisonment within or below the range corresponding to an offense level of 28 and the criminal history category calculated by the Court, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum.

WAIVER OF RIGHTS CONCERNING PLEA COLLOQUY AND FACTUAL BASIS

27.  Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing; (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

Defendant further agrees that this paragraph of the agreement is severable.  Thus, defendant's waivers are binding and effective even if, subsequent to defendant's signing this agreement, defendant declines to plead guilty, the Court declines to accept his guilty plea, or, if this agreement is of the type described in Federal Rule of Criminal Procedure 11(c)(1)(A) or (c)(1)(C), the Court rejects this agreement.  Defendant also agrees that his waivers are binding and effective even if some other portion of this agreement is found to be invalid by this Court or the Ninth Circuit.

RESULT OF VACATUR, REVERSAL OR SET-ASIDE

28.  Defendant agrees that if any count of conviction is vacated, reversed, or set aside, the USAO may: (a) ask the Court to resentence defendant on any remaining counts of conviction, with both the USAO and defendant being released from any stipulations regarding sentencing contained in this agreement, (b) ask the Court to void the entire plea agreement and vacate defendant's guilty pleas on any remaining counts of conviction, with both the USAO and defendant

24

being released from all their obligations under this agreement, or (c) leave defendant's remaining convictions, sentence, and plea agreement intact.  Defendant agrees that the choice among these three options rests in the exclusive discretion of the USAO.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

29.  Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>EFFECTIVE DATE OF AGREEMENT</u>

30.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

<u>BREACH OF AGREEMENT</u>

31.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant

United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered guilty pleas pursuant to this agreement, defendant will not be able to withdraw the guilty pleas, and (b) the USAO will be relieved of all its obligations under this agreement.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

32.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

33.   Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 18 are consistent with the facts of this case.  While this paragraph permits

26

both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

34. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be between the statutory mandatory minimum and the statutory maximum.

NO ADDITIONAL AGREEMENTS

35. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//
//
//
//
//
//

PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

36.   The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States
Attorney


_____          4/17/2026
ALEXANDER S. GORIN                        _____
Assistant United States Attorney          Date


_____          04/17/2026
ARTEM VLADIMIROVICH REVENSKII             _____
Defendant                                 Date


_____          4/17/2026
JOHN TARGOWSKI                            _____
Attorney for Defendant ARTEM              Date
VLADIMIROVICH REVENSKII

28

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. This agreement has been read to me in Russian, the language I understand best. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____     04/17/2026
ARTEM VLADIMIROVICH REVENSKII        Date
Defendant

29

CERTIFICATION OF INTERPRETER

I, Vladimir Feskulman am fluent in the written and spoken English and Russian languages. I accurately translated this entire agreement from English into Russian to defendant Artem Vladimirovich Revenskii on this date.

_____     ___4/17/26___
INTERPRETER                          Date

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am Artem Vladimirovich Revenskii's attorney. I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.

_____     ___4/17/26___
JOHN TARGOWSKI                       Date
Attorney for Defendant ARTEM
VLADIMIROVICH REVENSKII

30

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 26- |
|---|---|
| Plaintiff, | I N F O R M A T I O N |
| v. | [18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 371: Conspiracy; 18 U.S.C. § 1028A: Aggravated Identity Theft; 18 U.S.C. §§ 981, 982, 1030 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| ARTEM VLADIMIROVICH REVENSKII, aka "Digit", aka "Digits", aka ".", | |
| Defendant. | |

The United States of America charges:

INTRODUCTORY ALLEGATIONS AND DEFINITIONS

At all times relevant to this Information:

A.   Defendant and Co-Conspirators

1.   Defendant ARTEM VLADIMIROVICH REVENSKII, also known as ("aka") "Digit," aka "Digits," aka ".", primarily resided in Russia.

2.   Co-Conspirator A, Co-Conspirator B, Co-Conspirator C, Co-Conspirator D, Co-Conspirator E, Co-Conspirator F, and Co-Conspirator G resided in Russia.

3.   22C was a Russian cybercriminal hacking group that, among other things, provided hacked and leaked personal information to its members.  Co-Conspirator A, Co-Conspirator B, and Co-Conspirator C

were members of 22C. Defendant conspired with members of 22C to further their illegal activities.

4.   Sector16 was a Russian government-sponsored hacking group established no later than January 2025 that targeted industrial control systems ("ICS") and supervisory control and data acquisition ("SCADA") systems in countries that were perceived to be enemies of Russia, including the United States of America and Ukraine.  Co-Conspirator D was the leader of Sector16, and defendant conspired with members of Sector16 to further their illegal activities.  Co-Conspirator E, Co-Conspirator F, and Co-Conspirator G were cybercriminals who conspired with defendant, including on Sector16 attacks.

B.   Definitions

5.   Telegram is a cloud-based encrypted messaging service that allows users to post messages in public channels and message users directly.

6.   Trafer or Traffer is a term used in Russian cybercriminal forums to refer to the actor responsible for directing victim users to a malicious platform (commonly through malware, phishing, or internet scams), for the purpose of harvesting and stealing their computer and website credentials.

7.   Supervisory Control and Data Acquisition ("SCADA") is a computer-based system that collects, analyzes, and displays real-time data from remote sites to monitor and control industrial processes. SCADA systems are commonly used in utilities, manufacturing, oil and gas production, and water and wastewater treatment facilities.

8.   A brute force attack is when a hacker uses trial-and-error to try to systematically guess the password associated with an

2

account. This can be done manually or with automated software that can use a preset list of common passwords.

//

//

//

COUNT ONE

[18 U.S.C. § 1349]

The United States or America hereby realleges and incorporates paragraphs 1 through 8 of the Introductory Allegations and Definitions of this Information.

A.    OBJECTS OF THE CONSPIRACY

Beginning on a date unknown, but no later than on or around October 22, 2024, and continuing through on or around October 31, 2025, in Los Angeles County, within the Central District of California, and elsewhere, defendant REVENSKII and others known and unknown to the United States of America, knowingly conspired and agreed with each other to commit Wire Fraud, in violation of Title 18, United States Code, Section 1343.

B.    MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished, and was accomplished, in substance, as follows:

1.    Defendant REVENSKII and his co-conspirators, including members of 22C, would engage in a booking refund fraud in collaboration with complicit hotels to use stolen, illegally purchased, and/or hacked website credentials of victims to make hotel reservations using stolen funds.

2.    Defendant REVENSKII would identify hotels and would direct others, including members of 22C, to contact the hotels to determine if hotel personnel were willing to be complicit in receiving fraudulent bookings.

3.    Defendant REVENSKII would direct co-conspirators to negotiate the split of stolen funds among the complicit hotel participants and the co-conspirators.

4

4. Defendant REVENSKII would obtain a spreadsheet containing tens of thousands of usernames and passwords for travel booking websites from a co-conspirator and then would share that spreadsheet with Co-Conspirator B and Co-Conspirator C for the purpose of accessing victims' online booking accounts.

5. Co-Conspirator B would attempt to use the usernames and passwords to login to victim accounts to determine if they had payment information saved to those accounts, and if so, co-conspirators would use that payment information to conduct fraudulent bookings.

6. If the username and password combination from the account information spreadsheets did not work, Co-Conspirator C would try to gain access to victims' travel booking accounts using brute force methods such as guessing common passwords.

7. Defendant REVENSKII and co-conspirators, including members of 22C, would make fraudulent bookings at complicit hotels and distribute the stolen funds to co-conspirators.

8. Defendant REVENSKII also developed an alternative method to engage in hotel booking fraud by creating fake travel agent websites to lure victims to view the website and then install malware on the victims' computers, which would enable defendant REVENSKII and his co-conspirators to remotely access those victim machines.

9. Defendant REVENSKII and co-conspirators, including members of 22C, would then use this remote access to victim computer systems to obtain personal information, including financial billing information.

10. Defendant REVENSKII and co-conspirators, including members of 22C, would use illegally obtained personal information to make

5

fraudulent bookings with complicit hotels who would then share a portion of money obtained from the booking.

11. As a result, defendant REVENSKII and co-conspirators, including members of 22C, intended to secure at least $153,923.63 from the fraudulent hotel bookings.

C.   OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendant REVENSKII and others known and unknown, committed and knowingly caused others to commit various overt acts within the Central District of California, and elsewhere, including but not limited to the following:

Overt Act No. 1:   On October 22, 2024, defendant REVENSKII directed Co-Conspirator A to analyze hotel chains at a particular link noting, "There are hotels in the USA."

Overt Act No. 2:   On October 25, 2024, Co-Conspirator A asked defendant REVENSKII whether there were updates regarding the hotels.

Overt Act No. 3:   On October 27, 2024, defendant REVENSKII advised Co-Conspirator A concerning how to structure financial transactions so that they would not be flagged for fraud.

Overt Act No. 4:   On October 30, 2024, defendant REVENSKII provided Co-Conspirator A with an update on the hotel booking fraud stating, "Hotels in Bali went to the meeting. Today [they'll] start sending numbers on booking."

Overt Act No. 5:   On October 31, 2024, defendant REVENSKII relayed to Co-Conspirator A an update from an unnamed co-conspirator about negotiations with complicit hotels saying, "Well, some have questions, kind of like: how are [we] withdrawing money, from a hotel? Payment with a card (who knows from where and which one). Then

are we registering for a return or something different? [We] need to have them to understand. Already have hotels."

Overt Act No. 6:   On October 31, 2024, defendant REVENSKII sent Co-Conspirator A two links to hotels on two popular travel booking websites.

Overt Act No. 7:   On November 3, 2024, defendant REVENSKII sent Co-Conspirator B information concerning the financial split of proceeds resulting from the fraudulent hotel bookings explaining 50% would go to the hotel, 25% to the trafer, 10% to defendant REVENSKII, 10% to Co-Conspirator A, and 5% to Co-Conspirator C.

Overt Act No. 8:   On November 3, 2024, Co-Conspirator C sent himself an email discussing the specific conditions needed for the hotel booking fraud including identifying which booking websites would be used and methods to evade potential suspicion of fraud which would block the transaction.

Overt Act No. 9:   On November 3, 2024, defendant REVENSKII discussed with Co-Conspirator B the current status of negotiations with hotel accomplices to the booking fraud stating "We are not uploading anything yet. We are waiting if they will agree. Negotiations are ongoing."

Overt Act No. 10:   On an unknown date, but no later than November 11, 2024, defendant REVENSKII obtained two Excel spreadsheets containing tens of thousands of victim usernames and passwords to access accounts on booking websites from an identified co-conspirator.

Overt Act No. 11:   On an unknown date, but no later than November 11, 2024, defendant REVENSKII transferred the two Excel spreadsheets containing tens of thousands of victim usernames and

7

passwords to Co-Conspirator B and Co-Conspirator C, including information for victims located in the Central District of California.

COUNT TWO

[18 U.S.C. § 371]

The United States of America hereby realleges and incorporates by reference paragraphs 1 through 8 of the Introductory Allegations and Definitions of this Information as though fully set forth herein.

A.    OBJECT OF THE CONSPIRACY

Beginning on a date unknown, but no later than February 2025, and continuing through on or about October 31, 2025, defendant REVENSKII with others known and unknown, knowingly conspired and agreed with each other to intentionally cause damage without authorization to a protected computer, in violation of Title 18, United States Code, Section 1030(a)(5)(A).

B.    MANNER AND MEANS OF THE CONSPIRACY

The object of the conspiracy was to be accomplished, and was accomplished, in substance, as follows:

1.    On an unknown date on or before January 2025, Co-Conspirator D created Sector16.

2.    Co-Conspirator D would recruit individuals with expertise in computer intrusions and offer financial compensation to individuals who gained unauthorized access and damaged SCADA systems of oil and gas infrastructure facilities in certain countries, including the United States, Ukraine, and other NATO Members.

3.    Beginning in approximately February 2025, defendant REVENSKII would work with Co-Conspirator E and members of Sector16 to develop business plans to professionalize the planned SCADA attacks against critical infrastructure.

4.    Sector16 members would primarily gain access to SCADA systems by scanning the internet for open ports in SCADA systems in

9

target countries and would use a saved "dictionary" of common or default passwords to gain unauthorized access to those systems.

5.    Sector16 members would conduct internet research to obtain additional information about the systems to which they gained access to further develop the business proposal outlining the planned cyber-attack.

6.    Defendant REVENSKII would then use these plans for SCADA attacks to sell Sector16's services to the Russian government.

7.    Defendant REVENSKII would develop a plan with Co-Conspirator E and members of Sector16 to engage in sabotage of Ukraine's critical infrastructure including a cyber-attack on a natural gas facility in the city of Poltava, a plot against gas stations in Kiev, and a plan to disable the entire Ukrainian electrical grid with the intention of causing numerous harms to Ukraine including, but not limited to, a physical breakdown of equipment at substations, power plants, and nuclear power plants; cutting off electricity to cities; reducing operational efficiency; opening locks of a hydroelectric plant to flood territories; and drone production failure.

8.    Between approximately March 2025 and July 2025, defendant REVENSKII would work with Co-Conspirator D and Sector16 to obtain unauthorized access to vulnerable SCADA systems in the United States with the intention of damaging each facility.

9.    Between February 2025 and no later than October 31, 2025, defendant REVENSKII would provide approximately $7,000 to $10,000 to Co-Conspirator D and Sector16 to facilitate the group's hacking activities.

10

C.    OVERT ACTS

10.   On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendant REVENSKII and co-conspirators known and unknown, committed and knowingly caused others to commit various overt acts including, but not limited to, the following:

Overt Act No. 1:    On an unknown date but no earlier than January 2025, an unknown co-conspirator gained unauthorized access to the SCADA systems of an oil facility in Texas enabling members of Sector16 to control oil pumps and storage reservoirs at the Texas facility.

Overt Act No. 2:    On September 17, 2025, defendant REVENSKII, in a private text message, discussed with Co-Conspirator F a plan to shut down the electrical grid in Ukraine explaining that defendant REVENSKII expects to receive 5,000,000 rubles (approximately $59,500 USD) to turn off all the electricity in Ukraine for three days, and saying "This project has already started. The money upfront given."

Overt Act No. 3:    On September 22, 2025, Co-Conspirator D, in a private text message, sent defendant REVENSKII a screenshot demonstrating unauthorized access to a non-public SCADA system for an oil and gas facility in North Dakota.

Overt Act No. 4:    On September 22, 2025, defendant REVENSKII, in a private text message, forwarded the screenshot of the SCADA system from an oil and gas facility in North Dakota to Co-Conspirator G and discussed whether the Russian government would be interested in paying for the SCADA access.

Overt Act No. 5:    On September 29, 2025, defendant REVENSKII, in a private text message, discussed with Co-Conspirator F the plan

11

for using a computer intrusion to cause damage to a natural gas facility in Poltava, Ukraine, stating, "Full access to gas equipment control. Hardware Impact Attack. Consequences: Gas pipeline deformation. Overload of ventilation equipment. Gas extraction equipment overload. Ignition. Explosion. Failure of the video surveillance system, power supply and distribution. Total damages from $600,000."

Overt Act No. 6:    On September 29, 2025, defendant REVENSKII, in a private text message, sent five images to Co-Conspirator F showing internal, non-public information from a SCADA system of a natural gas facility in Poltava, Ukraine.

Overt Act No. 7:    On September 30, 2025, defendant REVENSKII, in a private text message, discussed with Co-Conspirator F that Sector16 was offered $75,000 if the group can cause a natural gas facility in Poltava, Ukraine, to explode.

Overt Act No. 8:    On September 30, 2025, defendant REVENSKII, in a private text message, discussed with Co-Conspirator E the expected payment for the upcoming cyber-attack on a gas facility in Poltava, Ukraine, stating they expected to receive $12,000 for media confirmation of an explosion.

Overt Act No. 9:    Between approximately March 2025 and July 2025, defendant REVENSKII collaborated with Co-Conspirator D and Sector16 on approximately four to seven SCADA attacks on facilities in the United States including facilities in the states of New York and Pennsylvania.

Overt Act No. 10:    On October 3, 2025, Co-Conspirator E, in a private text message, discussed with defendant REVENSKII the media coverage of the cyber-attack on natural gas infrastructure in

Poltava, Ukraine, saying "Because the attacks have crossed with our attack. But there is no media coverage of drone strikes on the gas infrastructure. After 8-10 hours it began to be [sic]. Appear. I believe that the cyber attacks are hidden under drone strikes."

COUNT THREE

[18 U.S.C. § 1028A]

The United States of America re-alleges and incorporates here paragraphs 1 through 8 of the Introductory Allegations of this Information.

Beginning on or about October 22, 2024, and continuing until no later than November 11, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendant REVENSKII, together with others known and unknown to the United States of America, each aiding and abetting the other, knowingly transferred, possessed, and used, without lawful authority, a means of identification that defendant knew belonged to another person, during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Wire Fraud, as charged in Count 1.

14

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts One or Three of this Information.

2.    The defendant, if so convicted, shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

15

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982, 1030]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982(a)(2) and 1030, in the event of any defendant's conviction of the offense set forth in Count Two of this Information.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense;

(b) Any personal property used or intended to be used to commit the offense; and

(c) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b)(1), 1030(i), and 1029(c)(2), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

16

court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

TODD BLANCHE
Acting Attorney General

BILAL A. ESSAYLI
First Assistant United States Attorney

IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division

MAXWELL COLL
Assistant United States Attorney
Deputy Chief, National Security Division

ALEXANDER S. GORIN
Assistant United States Attorney
National Security Division